663 P.2d 366

**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Gene Curtis BALLINGER,**
**Defendant-Appellant.**

**No. 5311.**

Court of Appeals of New Mexico.

March 15, 1983.

John B. Bigelow, Chief Public Defender, Lynne Corr, Asst. Appellate Defender, Santa Fe, for appellant.

Jeff Bingaman, Atty. Gen., William Lazar, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

WALTERS, Chief Judge.

At the direction of the Supreme Court, and according to its Order entered following its grant of certiorari in this matter, we withdraw our opinion filed on July 6, 1982, and substitute the following:

## OPINION ON REMAND

Warren Uecker was found dead on July 22, 1980, with a .32 caliber bullet lodged in his chest. The body was discovered in a shallow grave on the Pine Cienega Ranch in Grant County. Medical testimony established death as a result of the gunshot wound. Defendant and John Rizzo were brought to trial on charges of conspiracy to murder and the first degree murder of Uecker. Rizzo was granted immunity on the second day of trial; the trial proceeded against defendant. Only the charge of murder was submitted to the jury.

The jury convicted defendant of second-degree murder and found, by separate ver-

dict, that defendant had not used a firearm in the commission of the crime. *See State v. Leyba,* 80 N.M. 190, 453 P.2d 211 (Ct.App. 1969).

Defendant abandoned 14 points of error listed in his docketing statement. *State v. Gonzales,* 96 N.M. 556, 632 P.2d 1194 (Ct. App.1981). The remaining points of alleged error are: (1) prosecutorial misconduct during grand jury proceedings; (2) improper admission of hearsay evidence; (3) impropriety of giving the instruction on aiding and abetting, and (4) impropriety of sustaining an attorney-client privilege claim, thus preventing impeachment of the State's principal witness.

We agree with defendant's fourth point, and reverse. Because the matter will be remanded, we discuss all of defendant's issues on appeal.

1. *Prosecutorial Misconduct.*

The grand jury proceeding was lengthy, and it was concerned with a bizarre scenario of numerous and diverse persons unhappily joined in a corporate enterprise. There was evidence of business squabbles, financial troubles, suspicions and accusations against defendant of mismanagement and misappropriation of corporate moneys, factionalization of stockholders and directors, two armed camps at the ranch and, finally, the disappearance of one of defendant's principal accusers and the discovery of his body three days later. Adding to the strange facts of this case was the manner in which officers were guided to the body: the State's main witness, Rizzo, "dowsed" maps to determine that Uecker had been shot. His dowsing also revealed the direction and distance where the gun and the body would be found, and that the body was shallowly buried under twigs and pine needles.

■ During presentment of the case to the grand jury, the prosecutor lapsed into conduct probably exceeding his proper role of assisting the grand jury in a fair and impartial manner. *State v. Martinez,* 97 N.M. 585, 642 P.2d 188 (Ct.App.1982). Defendant catalogs instances when the prosecutor allegedly distorted the testimony of

some witnesses; told what a witness knew instead of questioning her; told the grand jury his beliefs regarding concert of action of some of the persons under investigation; answered questions on which there was no testimony; injected his personal opinion about the inferences to be drawn from polygraph tests relating to the credibility of witnesses, and other comments in the nature of conversations with the jury regarding the polygrapher's dilemma when faced with inconclusive tests. Defendant complains also of alleged hearsay evidence presented to the grand jury and at trial. (We discuss that specific objection hereafter.)

In the context of the entire grand jury proceedings, we are unable to say that the prosecutor's comments amounted to deceitful or malicious overreaching to such degree as would subvert the grand jury proceedings. *Buzbee v. Donnelly,* 96 N.M. 692, 634 P.2d 1244 (1981).

The prosecutor's summarization of the knowledge and whereabouts of one witness on the day of decedent's disappearance was made in her presence and during her testimony, and her questioning continued thereafter. She did not dispute the summary. Some of the "conversation" complained of consisted of the prosecutor's responses to jurors' questions. His answers outlined matters of testimony that would be given by witnesses who had not yet been called. In an effort to maintain coherence and continuity, much of the prosecutor's commentary was unavoidable; some of it was necessary in explanation of facts, law, and sequential procedures unfamiliar to the jury. *See State v. Saiz,* 92 N.M. 776, 595 P.2d 414 (Ct.App.1979). Although considerably more frequent and extensive than the remarks discussed in *Martinez, supra,* the prosecutor's comments here resulted, to a large degree, from the complexity of the evidence and the number of persons targeted in the grand jury proceedings.

There was a massive amount of evidence to support the grand jury's finding of probable cause to accuse. Section 31–6–10, N.M.S.A. 1978. Even so, *Buzbee, supra,*

reaffirmed the holding in *State v. Chance,* 29 N.M. 34, 221 P. 183 (1923), that in the absence of statutory authority "the courts are without power to review the sufficiency, legality or competency of the evidence upon which an indictment is returned." (96 N.M. at 706, 634 P.2d 1244.) If we were not otherwise satisfied that the prosecutor's conduct did not amount to denial of due process in obtaining an indictment against defendant, we would nevertheless be severely limited by the rule of *Chance, supra,* in reviewing the legality of the evidence presented.

There was no error in refusing to dismiss the indictment on grounds of prosecutorial misconduct.

2. *Hearsay Evidence.*

The same allegedly hearsay evidence defendant claims should not have been submitted to the grand jury was introduced at trial. He complains of admitting extrajudicial statements of the decedent, some contained in exhibits and the rest in testimony of various witnesses.

█ Our review of the transcript convinces us that none of the evidence was offered for the truth of the matters asserted, in contravention of the hearsay rule, but was admitted into evidence under the exceptions as verbal acts, *State v. Aragon,* 85 N.M. 401, 512 P.2d 974 (Ct.App.1973), to show that certain acts were done; or to show defendant's then-existing mental state, N.M.R.Evid. 803(3); or as statements of recent perception, N.M.R.Evid. 804(b)(2), *supra.*

█ Additionally, the evidence was relevant and not erroneously admitted under N.M.R.Evid. 403, to show existence of defendant's motive, and to connect defendant, at least inferentially, to the crime. *See* N.M.R.Evid. 401, 402, *supra,* and cases collected in the compilation. When evidence is admissible under any theory, the trial court's decision to admit it will be upheld. *State v. Beachum,* 83 N.M. 526, 494 P.2d 188 (Ct.App.1972). The same ruling will apply even more forcefully under *Chance, supra,* to evidence presented to the grand jury.

3. *The Instruction on Aiding and Abetting.*

U.J.I.Crim. 28.30, N.M.S.A.1978, was given to the jury. It read:

The defendant may be found guilty of a crime even though he himself did not do the acts constituting the crime, if the State proves to your satisfaction beyond a reasonable doubt that:

1. The defendant intended the crime be committed;

2. The crime was committed;

3. The defendant helped, encouraged or caused the crime to be committed.

Defendant claims there was insufficient evidence to show the third element.

The jury heard the testimony of numerous witnesses about the running feud between decedent's North faction on the ranch and defendant's clique on the South. Ballinger ran a treasure-hunting operation on the ranch and Rizzo taught the technique of dowsing, to which Uecker's group objected. Uecker complained to officials that Ballinger's group was violating state laws; as a result, Ballinger was contacted by several State agencies and also received a letter from the Attorney General's office requesting information to satisfy allegations that the Post Secondary Education Act, the Unfair Practices Act, and the False Advertising Act were not being complied with.

Ballinger's faction, in the meantime, was reporting to federal authorities the paramilitary and Minuteman-type activities of Uecker's group on the north end of the ranch. Rizzo was shown to be strongly under Ballinger's influence, and supportive of his objections to the North group.

During the year or more that ill feelings festered, Ballinger reportedly sought Rizzo's help in hiring "hit" men to "blow Uecker away." In the presence of others, Ballinger threatened Uecker's life repeatedly. Uecker, at the same time, was trying to rally support from other co-owners to divest Ballinger of his ownership interest and his management of the ranch, claiming that Ballinger was defrauding the corporation and ruining the corporation's camping-ranching program.

The State suggests that the evidence and the circumstances point to Rizzo as the principal. We are not concerned with whether the jury determined that either Rizzo or Ballinger was the actual killer; our review is limited to determining whether the evidence would support defendant's conviction as an accessory. Section 30–1–13, N.M.S.A.1978; *State v. Nance,* 77 N.M. 39, 419 P.2d 242 (1966).

The evidence was conflicting regarding Ballinger's whereabouts after Uecker was indisputably placed at Ballinger's ranch house between 4:00 and 5:00 p.m. on July 19, 1980. The jury heard all of the testimony and, because the facts surrounding Uecker's last appearance were disputed, the jury properly could have determined the proof inadequate to show that Ballinger pulled the trigger, but sufficient to establish that he intended the crime to be committed, that it was committed, and that Ballinger "helped, encouraged or caused" it to be committed. Indeed, there was a vast amount of evidence that Ballinger wanted to be rid of Uecker and frequently discussed means of doing so. That the jury could have refused to find that defendant personally committed the murder is not alone a sufficient reasonable hypothesis that he did not aid and abet its commission. *State v. Atwood,* 83 N.M. 416, 492 P.2d 1279 (Ct. App.1971). Under the facts of this case, it was not error to give the accessory instruction to the jury.

4. *The Attorney-Client Privilege.*

The State's accusing witness, Rizzo, was represented by a local attorney from July 22, 1980, the day Uecker's body was found and the day before Rizzo was arrested for murder, until June 15, 1981, when he hired a new attorney. Rizzo was scheduled to be tried in February 1981, but his trial was postponed at the request of the State and a grand jury convened instead. It was as a result of the grand jury investigation that Ballinger was indicted for murder as a principal or as an accessory.

On July 14, 1981, the day after Ballinger and Rizzo were brought to trial on the grand jury indictment, Rizzo was granted immunity. He testified at Ballinger's trial that he watched from a window of the ranch house and saw defendant marching decedent at gun-point from the area of Ballinger's corral, across the yard and beyond his sight, just hours before decedent was found to be missing. Rizzo's evidence conflicted with testimony of defendant's wife that defendant was asleep at the time and that, instead, she had observed Rizzo drive away from the ranch house accompanied by Uecker during the same time period. Uecker was not seen alive again by any witness.

Rizzo's court testimony was given almost a year after he was first bound over on the charge of murdering Uecker. During all that period he never related to police authorities the story, inculpating Ballinger, that he told at trial. Shortly after he hired new counsel, that attorney met with a federal attorney who had been selected by him and by the prosecutor as an independent evaluator, to hear what Rizzo's testimony would be. Following that conference, the immunity deal was made.

Faced with Rizzo's immunity and surprising accusatory evidence after the trial began, the defense sought to question Rizzo and his first attorney to learn (1) whether Rizzo had related to the first attorney the incriminatory evidence against Ballinger at any time, and (2) whether there had been any discussion between them about a grant of immunity in exchange for favorable prosecution testimony. The trial court refused to allow Rizzo to be questioned on the first matter, or to permit the defense to subpoena the lawyer, on grounds of attorney-client privilege.

On direct examination, however, Rizzo did testify as follows:

Q. And the first time that your story was told to law enforcement officers in full was not long after the anniversary of the man's death. Is that correct?

A. Yes.

Q. Why did you wait all that time, Mr. Rizzo?

A. I felt I was next. If anybody had known what I knew I would not be here.

Q. Did you in any way rely on the advice of counsel in remaining silent during that year?

A. In that year I changed attorneys. *The first attorney I had did not make it clear to me because I believe they had asked about turning State's evidence* and I took it that they wanted me to confess to something I didn't do. So I did not say anything to anybody and after I changed attorneys he explained to me what it was. (Our emphasis.)

The defense contends that Rizzo opened up this area of attorney-client communications by voluntary disclosure and, under N.M.R. Evid. 511, N.M.S.A.1978, waived the privilege.

■ The quoted portion of Rizzo's testimony admits of no other conclusion. If Rizzo and his former attorney discussed immunity, it is inconceivable that they did not also discuss facts which would form the justifications for obtaining immunity. Rule 511 establishes waiver if "any significant part of the matter or communication" is disclosed. Certainly, any discussion of "turning State's evidence" is a significant part of the subject matter counsel wished to inquire into. *See* 2 Weinstein's Evidence, ¶ 511[02] and cases cited at footnote 18 therein. *See also In re Arnson Estate,* 2 Mich.App. 473, 140 N.W.2d 546 (1966), where waiver was held when the client testified that she had been misadvised by her counsel.

The discussion at 8 Wigmore, *Evidence* 636, § 2327 (McNaughton Rev.1961), explains the rule of waiver following voluntary disclosure:

There is always ... the objective consideration that when [the privileged person's] conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that

result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.

Defendant should have been allowed to cross-examine Rizzo regarding his conversations with his first attorney, and the subpoena for the attorney should not have been quashed. Since the privilege may be claimed only by the client, N.M.R.Evid. 503(c), N.M.S.A.1978, and since we conclude that the client Rizzo waived the privilege, there was no basis upon which to rest disallowance of the attorney's evidence.

We therefore remand this case to the district court for the limited purpose of receiving evidence from Rizzo and his first attorney, and any other witnesses, on the entire subject matter of immunity and the facts suggesting it which were discussed between themselves, or with others in a position to seek or grant immunity to Rizzo. The trial court shall then determine whether the evidence on that issue is sufficient to require that defendant be granted a new trial at which the previously excluded evidence shall be admitted. *State v. Torres,* 81 N.M. 521, 469 P.2d 166 (Ct.App.1970).

Immunity having been granted to Rizzo and testimony having been given by him in a judicial proceeding pursuant to that grant, due process and the privilege against self-incrimination mandate that Rizzo's immunity may not be withdrawn if a new trial is granted. *State v. Doe,* 92 N.M. 354, 588 P.2d 555 (Ct.App.1979); *State v. Gabaldon,* 92 N.M. 230, 585 P.2d 1352 (Ct.App.1978).

The case is remanded to the trial court to proceed in accordance with the instructions set forth in this Opinion.

IT IS SO ORDERED.

WOOD and LOPEZ, JJ., concur.